(Decided July 11th, 1866.)

---

GEORGE W. HOWARD ET. AL. *vs.* ISAAC OPPENHEIMER, CLAIMANT AND GARNISHEE OF ERNEST OPPENHEIMER.

ATTACHMENT ON ORIGINAL PROCESS: ACT OF 1864, CH. 306: PRACTICE, MOTION TO QUASH: AFFIDAVIT,—FORM OF: ACT OF 1795, CH. 56.— In a proceeding by attachment on original process under the Act of 1864, ch. 306, it was alleged in the affidavit of the plaintiffs, "that the plaintiffs have a good reason to believe that Ernest Oppenheimer, the defendant, has assigned, disposed of or concealed his property, or some portion thereof, with intent to defraud his creditors," and "that the defendant has removed, or is about to remove his property, or some portion thereof, out of this State with intent to defraud his creditors." —HELD:

That this form of affidavit has been long sanctioned in Maryland under the Act of 1795, ch. 56, in the case of an absconding debtor who may be alleged "to have actually run away, or fled from justice, or removed from his or her place of abode"—the affiant not being confined to one or the other of the disjunctive charges or allegations.

PRACTICE IN ATTACHMENT: PRODUCTION OF CAUSE OF ACTION: BOND,— ACCEPTANCE AND APPROVAL OF.—The transcript of the record of proceedings in the cause, after reciting that the clerk of the plaintiff had

made the affidavit required by the Act of Assembly, proceeds—"which said affidavit, together with an account and bond thereto annexed, are in the words and of the following tenor," &c. The writ itself, also a part of the certified transcript, recited that "whereas, W. H. M. has appeared," &c., "and produced and filed in Court his affidavit, account and bond," &c., "we therefore command you," &c. It also appeared that there was a memorandum of acceptance on the bond not signed by the clerk.—Held.

1st. That the fact of the production of the cause of action as required by the law, at the time the affidavit was made, was sufficiently attested by the recital in the introductory certificate of the record, and in the recital of the writ, which was issued and signed by the clerk, before whom, the affidavit was made.

2nd. That the memorandum of acceptance on the bond, though not signed by the clerk, and the recital in the writ issued and signed by him, that the bond was produced and filed in Court at the time the account was filed and the affidavit made, are sufficient evidences of his approval of the bond required by the law to be given before issuing the attachment.

——: Bond,—Condition of: Costs.—The objection to the bond filed with the affidavit, that it is "only conditioned to satisfy costs and damages to the defendant, and not to any other person interested in the proceedings," is not well taken, the condition being in the words prescribed by the 41st sec. of the law, and broad enough to cover all costs in the case.

——: Trial of Title on Issues, and under Motion to Quash.—In attachment cases, in which other parties interpose claims to the property seized under the writs, a practice prevails in Maryland, which has been sanctioned, for docketing cases between the claimants and the attaching creditors, and trying the title on issues framed or made by the pleas, by a jury, before the Court makes final disposition of the attachment.

But an agreement and preparation for a submission to and trial by the Court of the cause upon its merits having been made by the parties, and the Court having taken cognizance of it, as it could do in such a case, in this summary way and in a summary proceeding, an objection then made to its exercise of the right by the Court to try the merits of the case comes too late.

That the Court has this right upon a motion to quash has been so frequently recognized by this Court, and has become so interwoven with the attachment law and practice in this State, that it can be no longer questioned as settled law.

Evidence in Attachment: Witness,—Examination of: Bill of Sale as Evidence vs. Oral Evidence of Grantor.—The defendant had

been examined by the garnishee and claimant in the attachment to identify the goods taken under the writ, as part of a stock sold by him to the claimant under a bill of sale. The plaintiffs then examined him, the claimant objecting, as to the manner of payment of the consideration, his connexion with the goods, his possession of them, the manner of their sale, the agency of the claimant in such sale and the manner of his exercise of ownership over the property, the application of the money, &c.— Held:

1st. That it was competent for the plaintiffs so to examine the witness, by way of cross-examination; that the examination related to, and was explanatory of, or characterized the ownership of the property by the claimant, of which, he testified in his examination-in-chief.

2nd. That the bill of sale being regularly executed, acknowledged and recorded, and the truth and fairness of its consideration sworn to by the grantee, and a part only of the circumstances elicited by the cross-examination tending to cast a shade of suspicion over the transaction, while others sustain its validity, the whole of the evidence thus drawn out cannot be held sufficient to overcome the bill of sale.

APPEAL from the Superior Court of Baltimore city.

This is an appeal from an order of the Superior Court of Baltimore city, (MARTIN, J.,) of the 26th of November, 1864, sustaining a motion to quash an *attachment on original process* issued on the 16th of June, 1864, from said Court, under the Act of 1864, ch. 306, and laid in the hands of Isaac Oppenheimer, against certain goods which, it was charged, had been conveyed and made over to him by his brother, Ernest Oppenheimer, with intent to defraud his creditors. A full statement of the case is made in the opinion of this court.

The cause was argued before GOLDSBOROUGH, COCHRAN, and WEISEL, J.

*George W. Brown* and *Arthur G. Brown,* for the appellants:

1st. While it is true that Courts have control over their own process, and may, therefore, in attachment suits, as in

other cases, interfere, on motion *in a clear case*, to prevent injustice being done by the wrongful exercise of the process of the court, yet a court has no right, on such preliminary motion, to try and decide *the merits of the case.* To do so would not only be irregular, but would intrench on the proper functions of the jury. *Declaration of Rights, Arts. IV. and XXIII. Constitution, Art. XII.,* sec. 5. *Drake on Attachment,* §§ 348, 416, 417. *Campbell vs. Morris,* 3 *H. & McH.,* 552, 553. *Barr vs. Perry,* 3 *Gill,* 823, 824, 826. *Bank of Com. vs. Rutland, &c.,* 10 *How. Pr. Rep.,* 7. *Spear, et al., vs. King,* 6 *Smedes & Marsh,* 284. *Boscher vs. Rouiller,* 4 *Abbott's Pr. R.,* 396. *Stewart vs. Mayer,* 7 *Md. Rep.,* 500, 511, 512, 513, *&c.* 3 *Martin, ( La. R.,)* 366. *Rice vs. Brady,* 2 *Cal.,* 132.

2nd. Although in Maryland, in cases arising under the old attachment law, greater latitude was allowed to our Courts on hearing motions to quash attachments than in most other States, they have never done more than inquire into certain collateral and incidental matters *dehors* the main issue. See *Campbell vs. Morris* before cited.

The Court of Appeals, in a late case arising under the attachment laws, *Lamden vs. Bowie,* 2 *Md. Rep.,* 334, reviewed and fully confirmed the decision in *Campbell vs. Morris,* quoted above, the Court coming to this conclusion, ( p. 339 :) "In view of this and the other Maryland cases referred to, we think that such defects not apparent in the proceeding upon attachment, as *according to the authority of Campbell vs. Morris* might be made available on a motion to quash, may now be used in the same manner, or may be pleaded at the option of the garnishee."

3rd. It is material to observe the difference between the attachment law of 1795, ch. 56, under which all the cases above cited arose, and the Act of 1864, ch. 306, now in force. It is perfectly evident that *debt* was the gist of the action

under the old attachment law, ( *Campbell vs. Morris,* 3 *H. & McH.*, 552,) while *fraud,* as well as debt, is that of the new. Therefore, the question of fraud, or of fraudulent intent, is now as exclusively a question for the jury, and as strictly denied to the consideration of the Court as the question of indebtedness was under the old law. In the absence, then, of defects in the proceedings, "the merits of the case," ( here the question of fraud,) should be left to the jury.

Therefore, where a claimant sets up a right to property attached under the Act of 1864, and under a transfer alleged to be fraudulent, and which fraud is a matter to be inquired of in a proceeding under said law, this *fraud* constitutes the *gist of the action,* and should be determined by the *jury,* and not on a motion to quash. 1 *Smith's Leading Cases,* 11. *Dewly vs. Bayntum,* 6 *East.,* 282. *Lindon vs. Sharp,* 6 *Man. & Granger,* 898.

II.—1. Even if the Court has jurisdiction in this case to try the question of fraud on a motion to quash, yet, where there are conflicting affidavits and the question is involved in doubt, it should not be decided by the Court, but be submitted to the jury. In all common law cases to be tried before a Court and jury, fraud is a question to be decided by the jury. 1 *Smith's Leading Cases,* 11. *Hanford vs. Archer,* 4 *Hill,* ( *N. Y.,*) 305.

III.—The transactions between Ernest Oppenheimer and his brother, Isaac, in reference to the sale of these goods attached by Howard, Cole & Co., are marked by nearly every badge of fraud that has ever been recognized by the Court. This will be best shown by a brief summary of the evidence as set forth in the record.

Ernest Oppenheimer, a merchant doing business in the city of Baltimore, bought during March and April, 1864, from Howard, Cole & Co., dry goods to the amount of $711.66, as per bill rendered.

About May 29th, Wm. H. Myers, a clerk of plaintiffs,

called on Ernest Oppenheimer about this bill. Oppenheimer complained of having been robbed, but put off Myers with promises of early payment. "Ten or twelve days afterwards," (June 8th to 10th,) Myers again called on E. Oppenheimer for payment, when he said: "Mr. Myers, you need not be uneasy about the debt, if I have time I will pay the whole of it, but I must have time; I only owe a few hundred dollars besides your claim, and some other debts of small amounts, and also some two or three hundred dollars to the bank, which I want to pay first." He also said, "here is my stock, enough to pay my debts, but I want time."

Between the dates of these conversations, viz., on June 3rd, 1864, Ernest Oppenheimer executed a bill of sale, by which, for $2,500, he sold to his brother, Isaac Oppenheimer, "All the goods, wares, merchandize and household furniture belonging to me, and contained in the two adjoining houses known as numbers 250 and 252 South Charles street, in said city, and which consists in part of the following named articles, that is to say: Cassimeres, calicoes, dress goods, domestic goods, ribbons, bonnets, hosiery, fancy goods, and notions, and also store fixtures, and also beds, bedsteads and bedding, one sofa, walnut and common chairs, easy chair, looking glasses, stands, tables, bureaus, stoves, clocks, carpets, kitchen and table utensils, glass-ware and cutlery, together with all other chattels of every kind now being in said houses and belonging to me."

It does not appear that Ernest Oppenheimer had any property whatever other than that assigned by this bill of sale.

The testimony of Ernest Oppenheimer was that Isaac Oppenheimer, the claimant in this case, is a shoe maker, talks very little English, knows nothing about the dry goods business, and still keeps his shoe store; that he is not acquainted with the value of dry goods, and took the stock and furniture entirely on the witness' statement; from the date of the bill

of sale till the attachment was served, the witness carried on the store as his brother Isaac's "agent;" did not keep any books or accounts while acting as agent, nor had he done so for some years previously; that Isaac told him to carry on the store for him; there was no written agreement, and he has never paid the witness anything for his services, though he promised to do so; and that there was no list of property except that in the bill of sale; that the witness included all his furniture and household goods in the bill of sale, and is now using the same furniture, and has never bought it back; that he was induced to part with all his family effects in order to raise money to pay his debts; that he has not paid them all, and does not know how much he owes, and keeps no books; that he has paid sundry bills amounting in the aggregate to a little upwards of $1000, and has no doubt the plaintiff's bill is correct, but has not paid it; and that he has spent a portion of the $2,000 received from his brother, and has a portion still in hand. Almost every recognized badge of fraud is here apparent. See *Twyne's Case*, 1 *Smith's Leading Cases*, 1.

1st. This sale had the signs and marks of fraud, because the sale is general, without exception of his apparel or any thing of necessity, for it is commonly said *quod dolosus versatur in generalibus. Lindon vs. Sharp*, 7 *Scott's N. R.*, 745.

2nd. The grantor continued in possession and used them as his own. 1 *Code*, 128.

3rd. Here was a trust between the parties, for the grantor possessed all and used them as his proper goods, and fraud is always apparalled and clad with a trust, and trust is the cover of fraud. *Archy vs. Hobden*, 4 *Wend.*, 514. *Burwell on Science*, 68. 42 *N. H.*, 510. *Hudson vs. Warner & Vance*, 2 *H. & G.*, 415.

4th. The conveyance was of the whole or greater part of the grantor's property, for no man can voluntarily divest

himself of all, or the most of what he has, without being aware that his creditors will suffer for it. *Jacob & Tomlin's Law Dic., Tit. Fraud, II.*

5th. It was out of the usual course of business. *Pilling vs. Otis,* 13 *Wis.,* 495.

6th. The Act of Assembly (1864, ch. 306,) under which this attachment was brought, only requires proof of fraudulent intent towards his creditors on the part of the debtor himself. It is, therefore, immaterial whether or not there is sufficient proof of fraud on the part of Isaac Oppenheimer, the grantee in this bill of sale.

7th. The fact that the bill of sale from Ernest to Isaac Oppenheimer was put upon record does not preclude the Court and jury from taking into consideration the fact of the continued possession by the vendor in connection with the other recognized *indicia* of fraud. The fact of continued possession is, in such a case, only not sufficient *of itself* to stamp the whole transaction as fraudulent and void. *Hambleton Ex'r vs. Haywood,* 4 *H. & J.,* 443. *Enders vs. Williams,* 1 *Medcalf,* ( *Ken.,*) 346. *Smith vs. Welch,* 10 *Wisconsin,* 91. *Thompson vs. Yeck,* 21 *Illinois,* 73.

IV.—The requirements of the Act of Assembly ( 1864, ch. 306,) have been fully complied with by the plaintiffs in this case.

V.—The defendant first proved the bill of sale by offering in evidence a certified copy, and then offered Ernest Oppenheimer to prove that he was the grantor in said bill of sale, and that the goods attached were part of the goods *sold* under said bill of sale to Isaac Oppenheimer, and that they *belonged* to him. This is a declaration by Ernest Oppenheimer that the transaction was honestly made as stated in the bill of sale, because if it was a fraud, and not a sale, the goods were not *sold* under said bill of sale, and did not *belong* to Isaac Oppenheimer. It was, therefore, strictly and properly within the scope of a cross-examination to inquire

into the facts of the alleged sale, and to ascertain whether the sale was real or fraudulent, and whether the goods *thereby* belonged to Isaac Oppenheimer, or were in fact fraudulently held by him for his brother, Ernest. And even if this were not so, the general and correct rule is, that whenever a witness is examined by one party he is thereby made a witness for all purposes, and may be cross-examined as to the whole case. 1 *Greenleaf on Evidence,* § 445.

Ernest Oppenheimer having moreover in his examination-in-chief, testified, that he had on the 3d day of June, 1864, sold the goods in question to his brother Isaac, whose property they then were, it was perfectly proper to contradict his statement by showing by the witness Myers, that Ernest Oppenheimer, a short time subsequent to the 3d of June, made an entirely different statement in regard to the ownership of the same goods. The plaintiff having first laid the foundation for such examination by asking the witness whether he had ever made such statements.

VI. The Act of 1864, is a remedial law, designed to protect creditors against fraudulent transfers of property by their debtors; and if on a motion to quash by the production of the bill of sale alleged to be fraudulent, and the testimony of the fraudulent grantor, the fraudulent grantee is enabled to quash the proceeding and obtain possession of the property, the whole intent and object of the law is defeated.

VII. In general, all statutes made against fraud should be liberally and beneficially expounded to suppress the fraud. *Twyne's Case,* 1 *Smith's Lead. Cases, p.* 4, *margin.*

8. The testimony of Ernest Oppenheimer must be rejected; he is a discredited witness, contradicted by himself, and by the witness Myers.

9. The objections made by the appellee to the form of the attachment cannot be entertained; because they were not presented to the Court below, and because a claimant of property has no right to make such objections.

*Benjamin F. Horwitz,* for the appellee, argued:

1st. That under the attachment system of Maryland, the owner of property attached, in an attachment issued against a third party, not only has the right, but is bound, " on the return of the attachment, to appear in Court and move to have the attachment quashed,"—" either for an apparent defect in the proceedings," or " by showing the property atached does not belong to the defendant." *Campbell vs. Morris,* 3 *H. & Mc.,* 552, 553. *Ranahan vs. O'Neale,* 6 *G. & J.,* 298. *Lamden vs. Bowie,* 2 *Md. Rep.,* 334. *Trieber vs. Blocher,* 10 *Md. Rep.,* 14. *Evans' Prac.,* 238, 239.

The Act of 1864, ch. 306, in sec. 44, on page 415, declares that " the practice and proceedings under the writ of attachment issued under its provisions, shall, in all respects not provided for in that Act, conform to the practice and proceedings under attachments against non-resident and absconding debtors."

The next question is, does the evidence in the cause sustain the first reason assigned in the motion ? That is, did the goods seized by the sheriff belong, at the time of the seizure, to Isaac Oppenheimer ? And this leads to the consideration of the questions raised by the exceptions, &c., filed by the claimant to the evidence. In order to see what is the evidence on which the question of ownership is to be determined, and its legal bearing as to those exceptions, it is submitted :

1st. That all the cross-examination of Ernest Oppenheimer, as it is called in the evidence, is in fact an examination-in-chief of said witness by the plaintiffs, and is their evidence. " A party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his direct examination ; and if he wishes to examine him as to other matters, he must do so by making the witness his own." 1 *Greenleaf's Ev., sec.* 445. *Phila. & Trenton R. R. Co. vs. Stimpson,* 14 *Peters,* 448, 461. *Floyd vs. Bovard,* 6 *Watts & Serg.,* 75.

2d. The questions marked "objected to by counsel for claimant," are manifestly inadmissible in the present attitude of this controversy, which is a controversy between Isaac Oppenheimer, claimant, and the plaintiff. The conversations that Ernest had with a Mr. Myers, in the month of May, cannot bind Isaac in any way, unless brought home to him or his knowledge—such conversations cannot be introduced to affect Isaac's title to the property attached in this case—which is the only question for determination.

Again, if the point be well taken that Ernest Oppenheimer was the plaintiff's witness, in his examination by the plaintiffs, then the testimony of Myers, introduced to contradict him, is in contravention of the principle of evidence that a party cannot impeach his own witness.

But whether these objections be well taken or not, it is submitted that the evidence is conclusive on the point that the property seized was Isaac's. It is admitted that the property seized is the same as that conveyed by the deed to be found on the same page. The deed proves itself. *Faringer vs. Ramsey*, 2 *Md. Rep.*, 375. *Glenn vs. Grover*, 3 *Md. Rep.*, 226. *Moore vs. Blondheim*, 19 *Md. Rep.*, 176.

And there is nothing in the proof to affect it in any way. It is, on the contrary, *sustained* by the whole testimony relating to it. The payment of the whole consideration is proved as stated, and there is *no act or declaration* of *Isaac,* the *owner* of the goods, shown, or even attempted to be shown.

2nd. The attachment laws being in derogation of the common law rights of the citizen, they have always been strictly construed; and if any of the proceedings are defective, the defects may be taken advantage of at any stage of the proceedings. *Brown vs. Somerville*, 8 *Md. Rep.*, 460. *Barr vs. Perry*, 3 *Gill*, 319, 320.

And this Act of 1864, in section 41, page 414, expressly says, "every attachment issued without a bond and affidavit,"

as required by the Act, "is declared illegal and void and shall be dismissed."

The following defects are to be found in them:

1. The charges in the affidavit are all in the alternative; they should be specific and distinct.

2. The cause of action was not produced to the clerk, as required by the Act.

3. The bond is only conditioned to satisfy costs and damages to the defendant, and not "to any other persons interested in the proceedings," as required by the Act.

4. The bond was never approved by the clerk.

*The appellant's counsel,* in reply, cited the following additional authorities. *Drake on Attachments,* 88 & 89, sec. 100. *Com. Bank of Man. vs. Ullman,* 10 *Sm. & Mar.,* 411. *Boobyshall vs. Emanuel,* 12 *Id.,* 63. *Van Alstyne vs. Erwine,* 1 *Kernan,* 331. *Goss vs. Gowan,* 1 *Richardson,* 477. *Drake on Attachment, secs.* 120 & 126. *Lucky vs. Miller,* 8 *Yerger,* 90. *Amos, et al., vs. Alnutt,* 2 *Sm. & Mar.,* 215. 1 *Greenlf. on Ev., sec.* 445. *Stewart vs. Mayor & C. C. of Balto.,* 7 *Md. Rep.,* 500. 1 *Ill. Stat.,* 693, *Love vs. Fairfield.* 16 *Ills. Rep.,* ( 5 *Gilman,*) 693. *Drake on Attachment,* 112, 114.

WEISEL, J., delivered the opinion of this Court.

This case presents questions of practice under the Act of 1864, ch. 306, being a sub-title to the codified attachment law of the State, under the head of " Attachments on Original Process." The first section of this Act specifies four cases in which an attaching plaintiff shall have the right to proceed by attachment. Two of these contain branches in the disjunctive. These two are incorporated in the affidavit in this case, in the language used in the said section. And it is alleged on the motion to quash, that this is fatal to the proceeding inasmuch that the charges in the affidavit are all

in the alternative, whereas they should be specific and distinct, so that if false, the party swearing falsely could be prosecuted for perjury.

There is no doubt that as they are put disjunctively, to allege either one would have been sufficient. But it does not follow that to allege all is to allege nothing distinctly, or within the design and intent of the Act. Nothing must be alleged which the Act does not authorise. A case different from that authorised by the law would not be within its purview or design. Here the objection is that the charge is broader than is necessary; but its extent is not beyond what the law allows. The party making the affidavit can cover the whole ground, if his case admits of it, within his knowledge or belief. In this case he swears only that the plaintiffs have good reason to believe that the defendant has done, or is about to, do the matters complained of, with intent to defraud his creditors. This form of affidavit has been long sanctioned in Maryland under the Act of 1795, ch. 56, in the case of an absconding debtor who may be alleged "to have actually run away, or fled from justice, or removed from his or her place of abode," the affiant not being confined to one or the other of the disjunctive charges or allegations.

It is also objected as irregularities that the cause of action was not produced before the clerk of the Court and so certified by him, and that the bond which the plaintiffs were required to give was not approved by the clerk.

The law requires that at the time of making the affidavit the plaintiff shall produce the bond, account or other evidence of the debt by which the debtor is indebted, and the same shall be filed among the papers in the cause. The law does not provide that this production shall be certified to in the certificate that sets forth the affidavit. That the cause of action should be produced when the affidavit is made to be filed among the papers in the cause is one of the condi-

tions upon which the right to the writ depends, and it must so appear among the proceedings; and we think that this requisite does sufficiently appear in the record, not only in the introductory certificate of the record, but in the recital of the writ, which is issued and signed by the clerk before whom the affidavit was made. It would be the better practice for the clerk to certify such production in the certificate which contains the affidavit, according to the form used in proceedings under the attachment law upon warrant, but as the law does not require this to be done, its omission in the certificate of affidavit is no irregularity.

The law also requires the approval, by the clerk, of the bond to be given by the plaintiff, before issuing the attachment. This should appear also from the proceedings, and we think that the memorandum of acceptance on the bond, though not signed by the clerk, and the recital in the writ issued and signed by him, that the bond was produced and filed in Court at the time the account was filed and the affidavit made, are sufficient evidences of his approval of the bond. We find, also, that the condition of the bond is in the words prescribed in the 41st section of the law, and, therefore, complies with the law, and that this condition is broad enough to cover the costs to any other persons interested in the proceedings, beside the defendant, who could sue for their use. See *Rev. Stat. of Ill., p.* 64, *secs.* 4 & 5, and *Love vs. Fairfield,* 5 *Gilm.,* 303 & 304.

We, therefore, think that on neither of these grounds were these proceedings liable to be quashed.

But the main ground relied upon by the garnishee to sustain his motion to quash the attachment, was the one assigned in the first cause, or objection, in which he claimed the property attached and seized under the writ as his own, at and before the time of seizure, and that the defendant in the attachment then had, and that he now has, no interest whatever, or right, in and to the same.

It appears from the record, that after filing the motion to quash, the Court below ordered it to be set down for hearing on a day named, by consent of counsel, with leave to both parties to take such testimony, to be used at the hearing of the motion, as they might desire, upon the usual notice; and that the parties afterwards produced and filed in Court certain testimony, and agreed to an order, that at the hearing of the motion the depositions filed should be used and have the same effect as if taken before a commissioner of the Court, subject, however, to all exceptions as to admissibility and relevancy.

This testimony consisted, on the part of the garnishee and claimant, of a bill of sale made and executed to him by the defendant in the attachment, on the 3rd day of June, 1864, (thirteen days before the issuing and levying of the attachment,) for all his property, including the articles levied on and scheduled under the attachment, and the deposition of Ernest Oppenheimer, the defendant; and on the part of plaintiffs, of the depositions of Wm. H. Myers and P. T. Wilson, with a *concessum* that the testimony of Ernest Oppenheimer, in reference to the identity of the property taken by the sheriff with the property conveyed by the bill of sale, was not to be disputed.   The bill of sale was duly acknowledged and sworn to on the day of its date, and it was admitted in the argument in this Court that it was recorded in the proper office on the same day.

It was strongly urged in the argument on the part of the appellants, that the Court below erred in trying and deciding, on a summary motion, and without the intervention of a jury, the merits of the cause and the question of fraud raised against the bill of sale upon which the garnishee and claimant relied as proof of his title; that the Court, in a doubtful case, and under the Constitution of Maryland, should have referred that matter to a jury; and further, as the Court did take cognizance of it, it erred in allowing certain

evidence which was objected to by the claimant, and in its application of the testimony relied on to establish the fact of fraud.

In attachment cases, in which other parties interpose claims to the property seized under the writs, a practice prevails in Maryland, which has been sanctioned, for docketing cases between the claimants and the attaching creditors, and trying the title on issues framed or made by the pleas, by a jury, before the Court makes final disposition of the attachment. This course is to be commended, and doubtless would have been pursued in this cause had application been made. On such an application we regard it would have been the duty of the Court to have granted it, and had the question of the *bona fides* of the bill of sale, and all other facts in proof of the title, submitted to the jury under such instructions as might arise, as in other jury trials. This right to the trial by jury of all issues of fact in civil proceedings in the several Courts of law in this State, where the amount in controversy exceeds the sum of five dollars, is guarantied by the Constitution of this State. *Const. of* 1851, *Decl. of R., Art.* 3, and *Art.* 10, *sec.* 4. *Const. of* 1864, *Decl. of R., Art.* 4, and *Art.* 12, *sec.* 5.

In this case neither party asked for a jury. On the contrary the record shows, not only an absence of such an application, but an agreement and preparation for its submission to, and trial by, the Court; and the Court having taken cognizance of it, as it could do in such a case, in this summary way and in a summary proceeding, the objection to its exercise of the right of the Court to try the merits of the case comes too late.

That the Court has this right upon the motion to quash, the law, as derived from the case of *Campbell vs. Morris*, decided in 1797, and reported in 3 *H. & McH.*, 535, was relied on as of controlling weight and authority. The opinion of the General Court, pronounced in that case by Judge

Chase, (552, 553,) is full and explicit, not only as to the province of the Court without the intervention of a jury, but as to the summary nature of an attachment proceeding prior to its dissolution under the old system, and the mode of proceeding by suggestion either from the defendant in the attachment, or a third person claiming an interest in the property attached, for the purpose of showing that the property taken did not belong to the defendant, and for taking proof *dehors* the proceeding to establish the claim. In that case condemnation was refused, and the exceptions were taken from rulings on the question of title. The cause went to the Court of Appeals, and upon the hearing there, this precise question as to the province of the Court below to hear and determine the merits without a jury, was fully and ably argued among the other interesting and important points which arose in that case. The Court of Appeals reversed the judgment of the General Court and gave judgment of condemnation. Although it does not appear—no opinion of the Appellate Court having been filed—on what grounds the reversal took place, yet the opinion of the General Court, on the point in question, and in all its parts, has been so recognized by this Court in various decisions in more recent cases, and has become so interwoven with the attachment law and practice in this State that it can be no longer questioned as settled law. It was so recognized in *Ranahan vs. O'Neale*, 6 *G. & J.*, 301. *Stone vs. Magruder & Brook*, 10 *G. & J.*, 386. *Barr vs. Perry*, 3 *Gill*, 323. *Lambden vs. Bowie*, 2 *Md. Rep.*, 338.

Recurring, then, to the judgment of the Court below, so far as that judgment was grounded upon the merits, the *bona fides* of the bill of sale, it is to be reviewed by this Court upon the proofs in the record. It arose upon a summary motion to quash, and that motion, upon the proofs introduced, is before us as it was before the Court below.

The objections taken by the garnishee and claimant to

certain testimony pointed out in the record, went upon the ground that it was designed to contradict the witness, Ernest Oppenheimer, who, by the course of the examination pursued by the plaintiffs, was to be regarded as their witness in the matters upon which he was examined by them; that these were not subjects of legitimate cross-examination, but of examination-in-chief. Ernest had been examined by his brother, the claimant, to identify the goods taken under the writ as a part of those he had sold to his brother under the bill of sale, and that they belonged to his said brother. The plaintiffs then examined him as to the manner of payment of the consideration, his connexion with the goods, his possession of them, the manner of the sale, the agency of his brother in it, and the manner of his exercise of ownership over the property, the application of the money, &c., all evidently with a view to show fraud in the transaction. This, we think, it was competent for the plaintiffs to do by way of cross-examination. It related to, and was explanatory of, or characterized the ownership of the property of his brother, of which he had spoken and testified in his examination-in-chief. As the witness of the claimant throughout, it was, therefore, clearly competent for the plaintiffs to introduce the testimony which was objected to, the purport of which was to contradict him upon matters connected with, or growing out of, the transaction. That testimony was, therefore, properly admissible.

We do not think that the testimony of Ernest Oppenheimer, drawn out on the cross-examination, is sufficient to overcome the deed made by him to his brother. That instrument was regularly executed, acknowledged and recorded, and the truth and fairness of its consideration sworn to by the grantee, as required by the law. Circumstances are deposed to by the witness which cast a shade of suspicion over the transaction, and again some facts which sustain its validity. The consideration was paid; it was equal, so far as we can judge,

to the value of the goods; the grantee proposed to sell them at auction and realize what he had paid; he yielded to the suggestion of Ernest to retail them by his agency; this mode of sale had been entered upon and was in progress when stopped by the attachment suits, and the money realized from the sales, in the brief interval of two weeks, was paid to the grantee. The case is too doubtful to justify a judgment that the transaction was stamped with fraud, and we, therefore, yield to the legal force of the bill of sale, and concur with the Court below in quashing the attachment.

*Order affirmed.*

(Decided July 11th, 1866.)