THE UNION TRUST COMPANY OF NEW JERSEY,
A CORPORATION.

vs.

ERNEST J. KNABE, JR., AND NELLIE KNABE, His
WIFE.

SAME vs. GUSTAV A. SCHLENS, ADMN., ETC., GAR-
NISHEE, AND

SAME vs. GUSTAV A. SCHLENS, GARNISHEE.

*Attachment*: motion to quash; questions of fact; determination
by Court.  Guaranty: bills and notes; endorsement; consid-
eration. Executory contracts: when complete. Lex loci
contractus: offer and acceptance; when binding;
contracts signed in one State; to be completed
in another; special agreement as to law;
agency; presumption. Married
women: agency. Evidence:
erroneous rulings;
when not re-
versible
error.

On a motion to quash, in attachment proceedings, the Court
has the right to determine questions of fact without the inter-
vention of a jury.                              pp. 603, 604

A wife by her endorsement upon her husband's note declared
her guarantee to be in consideration of the making, at her
husband's request, of the loan evidenced by the "within note,"
etc., and of the sum of one dollar; in a suit under the guaranty,
it was *held*, that evidence was admissible to show that the money
consideration had never been paid, and that the only considera-

tion for the guaranty was the loan to be made on the "within note."                                              p. 606

In such a case, unless the loan to be secured by the note was actually made, the guarantee was executory and could only become binding upon the making of the loan.        p. 606

Such guarantee was not in consideration of her promise to make the loan, but rests upon a loan actually made; and unless the loan was made in accordance with the terms of the note, it was not a complete and binding obligation of the guarantor.

p. 606

Where an offer contemplates an acceptance by the doing of an act, the contract is formed, not by a promise to do the act, but by actually doing it; an offer is revocable at any time before the act is done, provided notice of the revocation has been communicated.                                         p. 606

Executory contracts of guaranty may be considered as mere offers to contract, and are not binding unless acted upon.  p. 606

Such contract of guaranty did not become binding on the wife, unless her offer to guarantee the payment of the note was accepted by the making of the loan represented by it.     p. 607

A contract is made only when the last act is done to make it the binding obligation of the parties.             p. 607

The law of the State in which a contract is made determines the capacity of the parties and the validity of the contract. p. 608

Courts look to the *lex loci* in construing a contract, and will impart to it validity according to those laws, unless it would be dangerous, against public policy, or of immoral tendency, to enforce it.                                        p. 608

Where such executory contract of guaranty, although it was signed in Maryland, was to be completed and made binding by the loan of the money referred to in the State of New Jersey, where a wife had not the power so to obligate herself, the guaranty can not be enforced against her or her property in Maryland.                                          pp. 608-609

Statements, that the contract was to be governed by Maryland law, were not sufficient to bind the wife where the party making them did not represent her and she was not a party to

such an agreement. An agreement by a grantor to remain bound as maker and endorser of a note does not have the effect of answering the original contract of the parties and does not change their liability thereon.                                              p. 610

The action of a trial court upon admitting or enforcing evidence does not form reversible error where the facts referred to have already been established by other testimony.          p. 611

*Decided February 4th, 1914.*

Three appeals in one record from the Baltimore City Court. (HARLAN, C. J.)

The facts are stated in the opinion of the Court.

The causes were argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Edward M. Hammond* (with whom was *Roger T. Gill* on the brief), for the appellant.

*R. Lee Slingluff* and *German H. H. Emory* (with whom was *Morris A. Soper* on the brief), for the appellees.

URNER, J., delivered the opinion of the Court.

This appeal is from an order of the Baltimore City Court quashing an attachment. The record is a voluminous one, and it will be necessary to state briefly the circumstances under which the controversy arises and the facts upon which the parties base their several contentions.

William Knabe and Ernest J. Knabe, Jr., who were engaged in extensive business enterprises, arranged with the appellant, the Union Trust Company of New Jersey, a corporation doing business in Jersey City, on the 20th of November, 1908, for the loan of $50,000.00 on the note of William Knabe, secured by collateral, with the understanding that they might secure an additional loan of $50,000.00, and on the 31st of December, 1908, the Trust Company made a further loan of $50,000.00 on a demand note of William Knabe, secured by the collateral. These notes were paid, or marked paid, on the books of the Trust Co. on the 13th of July, 1909, and on the same day the Trust Company made a loan of $80,000.00 on the demand note of Ernest J. Knabe, Jr., of that date, secured by a bond of the United Surety Company of Baltimore, guaranteeing the payment of a part of said sum, and by other collateral. A number of payments were made on the $80,000.00 note, reducing the amount due thereon on March the 1st, 1910, to $65,000.00. In the meantime some question was raised as to the validity of the bond of the Surety Company, and on the 1st of March, 1910, Ernest J. Knabe, Jr., gave the Trust Company a new note for $65,-000.00 (the amount then due on the $80,000.00 note), secured by collateral and endorsed by his wife and William Knabe, guaranteeing the payment thereof, and on the same day the note of $80,000.00 was marked paid on the books of the Trust Company and the bond of the Surety Company was surrendered. Payments were made on the $65,000.00 note until June 1st, 1910, when the balance due was $29,191.65. Demand was made upon William Knabe and Ernest J. Knabe, Jr., for the payment of this balance, and on or about the 12th of January, 1911, Ernest J. Knabe, Jr., went to the office of the Trust Company for the purpose of securing further time. On the 24th of January, 1911, the president of the Trust Company wrote N. Rufus Gill & Sons, attorneys in Baltimore, as follows:

"Jersey City, N. J., Jan. 24, 1911.

Messrs. N. Rufus Gill & Sons,

   Wallis Building,

      215 St. Paul St.,

         Baltimore, Md.

Gentlemen:—

We hold a note made by E. J. Knabe, Jr., and endorsed by Wm. Knabe and Mrs. J. Nellie Knabe, the wife of E. J. Knabe, Jr., a copy of which is enclosed herewith. The note was originally for the sum of $65,000 with the following collaterals attached:

   200 shares American Piano Co.,75 Pref.

   500 shares American Piano Co. Common.

   448 shares Commercial & Farmers National Bank stock.

   14M Manister Light & Traction 5s.

   29M Pittsburgh, Binghampton & Eastern R. R. 5s.

   5M Hudson River Electric Power 5s.

   110 shares Knickerbocker Ice Co. of Baltimore.

   100 shares United Surety Co.

   2 shares Commercial & Farmers Nat. Bank.

   250 shares Farmers Bank of Canada.

But from time to time payments have been made and collateral surrendered, reducing the note to $29,191.65 plus protest fees and interest to date, and leaving in our hands collateral as follows:

   $29,000 Pittsburgh, Binghampton & Eastern R. R. bonds.

   $5,000 Hudson River Electric Company bonds.

   110 shares Knickerbocker Ice Company of Baltimore.

   250 shares Farmers Bank of Canada.

We desire you to begin action to recover payment of the amount in question, but before taking any steps, would be pleased to have you advise us whether in your judgment we should first proceed to dispose of the collateral in accordance with the terms of the note and apply the proceeds as part payment. We prefer not doing this if there is any chance of our securing the full payment of the note with interest otherwise.

We understand that Mrs. J. Nellie Knabe is the only daughter of her father, who is a widower with quite some means in the form of a trust estate left by his wife, from which he derives the income during his lifetime and upon his death the moneys revert to his daughter. We also understand that Mr. Knabe has some valuable pieces of real estate in Baltimore and vicinity. If these conditions are so, it is very possible that you might be able to make some arrangement for adjusting the matter for us without the necessity of bringing suit or the sale of the securities.

The payment of the note has been formally demand‑ ed, and on failure to pay the note was duly protested.

Awaiting your advise, we beg leave to remain,

Very truly yours,

(Signed)    Samuel Ludlow, Jr.,

"L‑W"                                President."

To that letter N. Rufus Gill & Sons replied from Baltimore, Md., January 25th, 1911:

"Union Trust Company,

Jersey City, N. J.

Dear Sirs:—

We have yours of the 24th enclosing your claim vs. Ernest J. Knabe and wife. Mr. and Mrs. E. J. Knabe are residents of Baltimore County; William Knabe of New York City.

We have made a partial examination, but can not make a full report until after we have examined the records of the Baltimore County Court, which we will do tomorrow and advise you as to the property of Mrs. Knabe.

We had an interview with Mr. E. J. Knabe this afternoon; he is now having his books balanced by the Baltimore Auditing Company. Until this is completed he will be unable to discuss settlements with any of his creditors. He has lost entirely, if not all, of his assets.

As to you disposing of the remaining collateral in your hands; under our practice, it will be necessary for you to do so and credit the net proceeds of your sale, so that your suit will be for the net amount due, together with interest. Mr. Knabe, however, makes the request that you withhold the sale of the collateral until he has submitted a statement prepared by the auditor; this of course is a matter in your discretion.

Mrs. Knabe is the daughter of Gustave Schlens, president of the William Wilkens Company, and is reputed to be worth $5,000,000. Mrs. Knabe's interest in her mother's estate is approximately valued at $200,-000. This we will ascertain more in detail from our examination tomorrow. At this time Mr. Knabe has no available assets from which you could collect your claim.

Very truly yours,
( Signed)   N. Rufus Gill & Sons."

Mr. Roger T. Gill had a further interview with Ernest J. Knabe, Jr., and his counsel on the 28th of January, 1911, and after communicating with the Trust Company he received the following letter from its president:

"Messrs. N. Rufus Gill & Sons,
215 St. Paul St.,
Baltimore Md.

Gentlemen :—Yours of the 28th inst., received. We desire to place with you for the protection of our interest the matter of the settlement of the Knabe loan.

We would suggest that you have Mrs. Knabe, if possible, execute direct, if you think best, the enclosed note as maker, which represents the balance due on the original transaction with interest and protest fees, the new note containing all of the collateral attached to the present loan, at the same time securing the consent of Mr. E. J. Knabe, Jr., the maker of the original note, to the surrender by us of the collateral, now

held, to Mrs. Knabe on the payment by her of the present unpaid loan and having Mrs. Knabe direct us to apply the proceeds of the enclosed note to the payment of the Knabe note bearing her endorsement. Also secure the endorsement of Mr. Ernest J. Knabe and his brother, William Knabe, to the new note.

This suggestion is made with a view of Mrs. Knabe becoming the direct obligor on the loan, we agreeing under the circumstances to defer any action on the collateral without prejudice to ourselves until, we will say, the first of June. If you think this is a satisfactory arrangement and does not prejudice us in any way, we would suggest that you endeavor to consummate it, you at the same time maintaining this claim under your jurisdiction and watching developments in connection with the Knabe affair, to the end that our interests may be fully protected during the time that we are carrying the loan on our books. Please advise us as to your conclusion and oblige,

Very truly yours,<br>(Signed)    S. Ludlow, Jr.,

"L-W"                                      President."

As the result of his interviews with Ernest J. Knabe, Jr., and his counsel, Mr. Gill received on the 2nd of March, 1911, the following note and endorsement and authority to apply the proceeds of the note:

"Demand Promissory Note.

$30,239.23.                    Baltimore City, Md.,
                               January 31st, 1911.

......On demand............after date.......I
..........promise to pay to the Union Trust Company of New Jersey, or order, ...................
thirty thousand, two hundred and thirty-nine and 23/100 dollars, with interest at....six....per cent. per annum, for value received, and have delivered as collateral security therefor $29,000 Pittsburgh, Binghampton and Eastern first mort. 5% bonds, $5,000 Hudson River Electric Co. Certificates, 110 shares

Knickerbocker Ice Company of Baltimore, 250 shares of Farmers' Bank of Canada......, and do agree on demand to deposit with the holder hereof such additional securities as such holder may from time to time require, and in default thereof this note shall, without demand or notice, instantly become and be matured, due and payable, and upon default of payment at maturity, whether such maturity is created by expiration of time or failure to deposit additional security as above agreed, do hereby authorize and empower the holder of this note to sell, transfer and deliver the whole or any part of such security and any additions thereto or substitute therefor, without demand, notice or advertisement, either at Brokers' Board or public or private sale, at their option at any time or times thereafter, with the right to such holder to become, at such sales, the purchaser and thereby the actual owner thereof, free and discharged of all equities, trusts and claims; or at the option of such holder as to the whole or any part of such security, original, additional or substituted, to proceed to recover thereon by suit at law or in equity, or otherwise, as if absolute owner thereof, the net proceeds of such sale or sales, action or actions, after payment of all costs and expenses, to be applied to the payment of this note, with interest. And it is further agreed that the securities hereby pledged, original, additional or substituted, or their proceeds, shall be applicable in like manner to secure payment of any and all other past, present or future obligations of the undersigned, matured or unmatured, held by the holder thereof, and all such securities now or hereafter in the hands of said holder shall stand as general collateral security for the whole of said obligations, upon like terms, conditions and agreements as herein contained; the undersigned remaining responsible, however, for any and all deficiency in payment of principal or interest, and hereby waiving any and every benefit, exemption and privilege under any law now or hereafter to be in force.

Wm. Knabe."

"Endorsement.

In consideration of the making, at the request of the undersigned, of the loan evidenced by the within note, upon the terms thereof, and of the sum of one dollar, the undersigned hereby guarantee to Union Trust Company of New Jersey, its successors, endorsers or assigns, the prompt payment of the said loan when due and hereby consent that the securities for the said loan may be exchanged or surrendered from time to time, or the payment of the said loan or any of the securities therefor extended, without notice to or further assent from the undersigned, and that the undersigned will remain bound upon this guarantee notwithstanding such changes, surrender or extension. The undersigned waive demand of payment from the maker of said note, and also waive notice of nonpayment or protest of the said loan or note, and also waive notice of any sale of the collateral securities held for the said note.

> M. Nellie Knabe,
> Ernest J. Knabe, Jr."

"Private Office
Ernest J. Knabe, Jr.,
Calvert Building.
Baltimore, February 3d, 1911.

Union Trust Co.,
    Jersey City, N. J.

Gentlemen :—

You are herewith authorized to apply proceeds of the enclosed note of $30,239.23 to the payment of the overdue note which you are now holding, with the further understanding that all collateral now attached to the old note is to be held as collateral for the note now substituted.

The old note is to be returned to us.

> Ernest J. Knabe, Jr.,
> William Knabe,
>     Per Ernest J. Knabe, Jr.,
> M. Nellie Knabe."

The above note and endorsement and authority to apply the proceeds were forwarded by Mr. Gill to the Trust Company with the following letter:

"Baltimore, Md., March 2nd, 1911.

Union Trust Company,

Jersey City, N. J.

Gentlemen:—

We today received from the counsel of Mr. Knabe note of Mr. William Knabe, endorsed by himself and wife, which we herewith enclose, to which you should pin the authority we send you authorizing the transfer of the collateral. We have returned the note of January the 31st, and have promised to have you send us the old protested note to return that also. We wish you would let us have this by return mail.

Yours very truly,

N. Rufus Gill & Sons."

In reply to the above letter the attorney and trust officer of the Trust Company wrote Mr. Gill as follows:

"Jersey City, N. J., Mar. 4, 1911.

N. Rufus Gill & Sons,

215 St. Paul St.,

Baltimore, Md.

Gentlemen:—Your communication of the 2nd inst. enclosing new Knabe note received. This new note is made by William Knabe to the order of the Union Trust Company of New Jersey and guaranteed by Nellie Knabe and Ernest J. Knabe, Jr.

The old note which we hold was made by Ernest J. Knabe to our order. The authority to take up the old note, which was a contract by Ernest J. Knabe with us, is signed by William Knabe, and we could, therefore, we feel, use the new note, contract of William Knabe with us, were it not for the fact that the authority to do so is signed William Knabe by Ernest J. Knabe, Jr. We have no power of attorney covering such a use of William Knabe's name by Ernest Knabe on file with us.

It will, therefore, be necessary to have a power of
attorney dated January 31, 1911, from William Knabe
to Ernest J. Knabe, Jr., covering the situation, or else
have a new note like the one you just sent us executed
in which Ernest J. Knabe is maker and Nellie and
William Knabe are guarantors.

Yours very truly,

G. R. Hendrickson, Atty."

On the 11th of March, 1911, counsel for William Knabe
and Ernest J. Knabe, Jr., at the request of Mr. Gill, sent
him the power of attorney from William Knabe to Ernest J.
Knabe, Jr., referred to in the letter of Mr. Hendrickson,
and Mr. Gill forwarded it to the Trust Company.

Charles H. Ferling, the trust clerk of the Trust Company,
states that he was the custodian of all notes upon which the
Trust Company made loans; that the note for $30,239.23 was
not delivered to him until the 21st of March, 1911; that up
to that date he had in his possession the old note for $65,-
000.00; that on the 21st of March, 1911, the note for $30,-
239.23 was handed to him by one of the officers of the Trust
Company, and that he put the loan through and applied
the proceeds of said note to the payment of the balance due
on the note of $65,000.00; that the loan on the note of $30,-
239.23 was made on the 21st of March, 1911, and that on
that day he surrendered possession of the note of $65,000.00;
that usually the notes are delivered to him as soon as they
are passed by the officers or executive committee; that he
does not know where the note for $30,239.23 was prior to
March 21st, 1911, but that it was not entered on the books
of the Trust Company or "used in payment of the balance
of the other note until March the 21st"; that no money was
loaned on said note, and no money was transferred in any
way by the book-keeper or any other way until" March 21st,
1911. Mr. Ludlow, the president of the Trust Company, tes-
tified in his examination in chief: "When we received the
note representing the loan of William Knabe for $30,239,23

that had been negotiated by Mr. Gill in Baltimore, we were
directed to apply the collaterals formerly on the loan of Er-
nest J. Knabe to the loan of William Knabe, but we had no
right to do that without the written consent of all parties
to the original Ernest J. Knabe loan, and as that authority
we received this communication marked 'Exhibit B' (letter
of February 3rd, 1911), but when we received it we noticed
that the signature of William Knabe had been made by Er-
nest J. Knabe, Jr.; we accepted the loan, but required that
the power of attorney authorizing Ernest J. Knabe to sign
for William Knabe be filed with us, and wrote Mr. Gill,
telling him to secure and forward the power of attorney,
which he subsequently did. When we received the authority,
or the power of attorney, it was filed in our files and the
loan physically put through the books and the check drawn
to the order of William Knabe, the loan having been made
to him, and then upon the authority of this communication
signed by the three Knabes, we endorsed the explanation
for the diversion of the fund from one name to the account
of another on the book as a memorandum for future refer-
ence and placed the proceeds of the check out of the treas-
urer's account for that liquidation of the Ernest J. Knabe
loan. This is an unusual process and naturally we required
proper authority for it, and did not act on it until the author-
ity was in legal shape so that there could be no question
about it, as is done not only with this loan but occasionally
under other circumstances." On cross-examination, Mr. Lud-
low, in answer to the question, "When did you receive the
William Knabe note (the note for $30,239.23) ?" replied:
"I think it was sometime in February (referring to paper).
No; it was March 4th, from N. Rufus Gill & Sons, Mr. Gill.
That was a new transaction. We did not discount it then.
I believe we called Mr. Gill's attention to the discrepancy
in the power of attorney attached to the latter authorizing
the proceeds of the note to be applied to the payment of the
Ernest J. Knabe, Jr., note, and for the transfer of the col-

lateral from the Ernest J. Knabe note to the William Knabe note. I refer by that to our letter of March 4th to N. Rufus Gill. * * * At that time, March 4th, we had accepted the note with that provision. Our transaction was not complete until the authorization for the signature of William Knabe. That was on or about the date this loan sheet was entered. We probably entered it the same day, about March 21st, 1911." He further testified that he passed on all new loans made by the Trust Company, and that they are then submitted to the executive committee for approval; that the committee has the right to reject or approve a loan; that the loan of $30,239.23 was approved by the executive committee sometime after March the 5th, 1911, as the final act on the part of the Trust Company, and that when they passed on it they had the right to reject or approve it. On the day following the day on which the above testimony was given the same witness, in answer to a question of counsel for the Trust Company, said: "In this particular loan the board of directors could not have approved the arrangements made, because the arrangement was made by me, with their knowledge, and explained from time to time, as the process proceeded, and was at all times acceptable to the board of directors"; that he reported to the board of directors and executive committee and that they approved of his action; but that there were no minutes of any resolution of the directors or executive committee; and in reply to the Court, he said that he could not recollect exactly what was said at any meeting and that no resolution was passed.

On the 30th of June, 1911, Ernest J. Knabe, Jr., and his wife and William Knabe, executed the following agreement:

"Whereas, William Knabe, as maker, executed and delivered his demand collateral promissory note dated Baltimore City, Md., January 31st, 1911, for the sum of $30,239.23, with interest, to the Union Trust Company of New Jersey, or order, for the payment of which note and interest Ernest J. Knabe, Jr., and M. Nellie Knabe, his wife, became endorsers on said note:

598    UNION TR. CO. OF N. J. vs. KNABE.

Opinion of the Court.    [122

And Whereas, The interest on said note due June
30th, 1911, amounting to $755.98, became due and pay-
able, but the said William Knabe was unable to pay
the same, and has requested said Trust Company to
grant him an extension of time to October 1st, 1911,
in which to pay said interest and principal debt, which
it has consented to do, by and with the consent of the
said endorsers;

Now, therefore, in consideration of the premises
and of the sum of one dollar, and of the extension of
time of payment as hereinbefore set forth, we, and
each of us, do hereby remain bound as makers and en-
dorsers respectively of the payment of said sum of
$30,239.23 and all interest due and to become due
thereon to the Union Trust Company of New Jersey
represented by the note aforesaid, and we, and each of
us, do hereby waive demand for payment, protest and
notice thereof.

Witness our hands and seals this 30th day of June,
A. D. 1911.

Witness: E. A. Dalle.

| | |
|---|---|
| Ernest J. Knabe, Jr. | (Seal) |
| M. Nellie Knabe. | (Seal) |
| Wm. Knabe | (Seal)" |

On the 26th of July, 1912, the Union Trust Company
sued out of the Baltimore City Court a writ of attachment
against Ernest J. Knabe, Jr., and M. Nellie Knabe, his
wife, as non-residents, and filed with the affidavit of its vice-
president the short note and account, the note of January
31st, 1911, and the agreement of June 30th, 1911, referred
to above. Certain property of Mrs. Knabe was attached, and
the attachment was also laid in the hands of Gustav A.
Schlens, individually and as administrator of Henrietta
Schlens.

A motion was filed in each case by the garnishee to quash
the attachment on the ground that M. Nellie Knabe was the
wife of Ernest J. Knabe, Jr.; that she signed the guaranty

on said note and said agreement at the request and for the accommodation of her said husband and William Knabe; that she did not by said endorsement or agreement obtain, directly or indirectly, any money, property or thing of value for her use, or the use, benefit or advantage of her separate estate; that said note was "negotiated, transferred and delivered to the plaintiff in the State of New Jersey, * * * and came for the first time into legal existence in said State"; that under the laws of the State of New Jersey she and her property are not liable on said endorsement, and that said endorsement as to her is void, and is not a proper voucher against her upon which to base an attachment.

Depositions were taken by agreement of counsel in Cincinnati, Ohio, and filed May 2nd, 1913. On the 12th of May, 1913, the Trust Company filed in each case a motion for a jury trial, as follows: "The plaintiff prays a jury trial in the above entitled case on the motions to quash filed by Gustav A. Schlens, individually and as administrator, garnishee." The Court below overruled the motion for a jury trial, and on the 4th of June, 1913, proceeded to hear the motion to quash without a jury.

In addition to the evidence to which we have already referred, there was further evidence to the effect that the note of $65,000.00 was endorsed by Mrs. Knabe in Maryland at the request of her husband, and was taken by him to New Jersey and there delivered to the Trust Company; that the endorsement on the note of $30,239.23 and the authority to apply the proceeds were signed by her in Maryland at the request of her husband, and were delivered by him or his attorney to N. Rufus Gill & Sons in Baltimore City; that the agreement of June 30th, 1911, was signed by her at the request of her husband in Cincinnati, Ohio, and was delivered by him or his attorney to said attorneys of the Trust Company in Baltimore City, Maryland; that the one dollar mentioned in said endorsement and in said agreement of June 30th were not paid, and that Mrs. Knabe did not on the faith of said endorsement or agreement obtain,

directly or indirectly, any money, property or thing of value, for her use, or for the use, benefit or advantage of her separate estate. There was also additional evidence reflecting upon the question whether the several notes we have referred to represented new and independent loans, or were only continuations or extensions of the previous loans, the contention of the Trust Company being that they were separate and independent transactions. But in the view we take of the case it is not necessary to make further reference to it. In connection with the correspondence between the Trust Company and N. Rufus Gill & Sons, Mr. Ludlow, Mr. Hendrickson and Mr. Gill testified that N. Rufus Gill & Sons were authorized to accept the note and endorsement. Mr. Gill further testified that he wrote the note and endorsement; that the place of payment was not inserted in the note, and that the note was dated in Maryland for the purpose of making it payable in Maryland; and that Ernest J. Knabe, Jr., and his attorney agreed that the note and endorsement should be treated as a Maryland contract and be delivered to him in Maryland for the purpose of avoiding the provisions of the New Jersey law. While this testimony in reference to an understanding that the endorsement should be treated as a Maryland contract is at variance with the positive recollection of counsel for Mr. Knabe, a further discussion of it is rendered unnecessary by other evidence in the case from which it affirmatively appears that counsel for Mr. Knabe did not represent Mrs. Knabe; that he never saw her in regard to the matter; that Mr. Gill never met her until after the suit was instituted, and that she signed the endorsement at the request of her husband without any further connection with or knowledge of the transaction.

The garnishee offered in evidence the New Jersey statute which provides:

"5. That any married woman shall, after the passing of this act, have the right to bind herself by contract with any person in the same manner and to the same extent as though she were unmarried, which

contract shall be legal and obligatory, and may be enforced at law or in equity, by or against such married woman, in her own name apart from her husband; provided, that nothing herein shall enable such married woman to become an accommodation endorser, guarantor or surety, nor shall she be liable on any promise to pay the debt, or answer for the default or liability of any person; provided, further, however, that if on the faith of any endorsement, contract of guaranty or suretyship, promise to pay the debt or to answer for the default or liability of any other person, any married woman obtains, directly or indirectly, any money, property or other thing of value, for her own use, or for the use, benefit or advantage of her separate estate, she shall be liable thereon as though she were unmarried, anything contained to the contrary notwithstanding."

Mr. Garrison, an attorney at law of New Jersey and general counsel for the appellant, testified that the statute referred to does not apply to a non-resident married woman; that there are no New Jersey decisions to that effect, but that he based his opinion upon the reasoning of the Court in *Thompson* v. *Taylor,* 66 N. J. L. 257; *Meyer* v. *Roche,* 77 N. J. L. 681, and *Basilea* v. *Spagnuolo,* 80 N. J. L. 88; that the guaranty of a married woman, executed and delivered to the agent of the payee or guarantee, a New Jersey corporation, outside of the State of New Jersey, would under the decisions referred to be enforceable against her. On cross-examination he stated that the endorsement of a promissory note by a married woman which does not become a completed contract until it reaches the State of New Jersey is not valid, but that that rule would not, in his opinion, under the decisions mentioned, apply to a non-resident married woman; that the decisions of New Jersey hold as to the contracts of resident married women that the law of the place where the contract is made, and not the law of the place of domicile controls as to the capacity of the parties; that the question where the same rule applies to non-resident married women

has not been decided either way in New Jersey; that under the law of the State of New Jersey, in accordance with the case of *Live Stock Co.* v. *Tuttle,* 40 N. J. L. 476, the last essential act necessary for the consummation of a contract determines the time and place of the making of the contract.

During the hearing of the motion to quash, twenty-nine exceptions were reserved by the Trust Company. The first exception is to the refusal of the Court below to grant the motion for a jury trial; the twenty-ninth is to the action of the Court in quashing the attachment, and the remaining exceptions are to rulings on the evidence.

In support of the first exception the appellant relies upon Article 5 of the Declaration of Rights, section 6 of Article 15 of the Constitution, and the cases of *Howard* v. *Oppenheimer,* 25 Md. 365; *Stewart* v. *Katz,* 30 Md. 334, and *Lanahan* v. *Heaver,* 77 Md. 605. In *Howard* v. *Oppenheimer, supra,* the Court said: "In attachment cases, in which other parties interpose claims to the property seized under the writs, a practice prevails in Maryland, which has been sanctioned, for docketing cases between the claimants and the attaching creditors, and trying the title on issues framed or made by the pleas, by a jury, before the Court makes final disposition of the attachment. This course is to be commended, and doubtless would have been pursued in this cause had application been made. On such an application we regard it would have been the duty of the Court to have granted it, and had the question of the *bona fides* of the bill of sale, and all other facts in proof of the title, submitted to the jury under such instructions as might arise, as in other jury trials. This right to the trial by jury of all issues of fact in civil proceedings in the several Courts of law in this State, where the amount in controversy exceeds the sum of five dollars, is guaranteed by the Constitution of this State." In that case the practice referred to had not been followed, neither party had asked for a jury trial, and it was objected in the Court of Appeals that the lower Court had no right to hear the motion to quash without a jury. In disposing of

that objection the Court said further: "That the Court has this right upon the motion to quash, the law, as derived from the case of *Campbell* v. *Morris,* 3 H. & McH. 535, decided in 1797, was relied on as controlling weight and authority. The opinion of the General Court, pronounced in that case by JUDGE CHASE (552,553), is full and explicit, not only as to the province of the Court without the intervention of a jury, but as to the summary nature of an attachment proceeding prior to its dissolution under the old system, and the mode of proceeding by suggestion either from the defendant in the attachment, or a third person claiming an interest in the property attached, for the purpose of showing that the property taken did not belong to the defendant, and for taking proof *dehors* the proceeding to establish the claim. The opinion of the General Court, on the point in question, and in all its parts, has been so recognized by this Court in various decisions in more recent cases, and has become so interwoven with the attachment law and practice in this State that it can be no longer questioned as settled law." In *Stewart* v. *Katz, supra,* the appellee moved to quash the attachment for defects apparent on the fact of the proceedings, and because he was the owner of the property. After disposing of the first ground of the motion, the Court said: "This disposes of all objections made or suggested, based upon alleged defects apparent on the face of the proceedings. The other reason assigned for quashing the writ goes to matters *dehors,* and relates to the validity of the bill of sale by which the appellee claims title to the property attached. A large mass of testimony has been taken on this subject, but, as we have stated, the judgment below was based exclusively upon the insufficiency of the affidavit. Upon the important question of the validity of this deed, the parties have never had the benefit of the Court's consideration and judgment. It is true, the question is open to us for decision on this appeal. Such questions may be raised on a motion to quash, and heard before the Court, in this summary mode, on evidence produced by the parties, if they elect so to try them. This

was decided in *Howard* v. *Oppenheimer,* 25 Md. 350, but in that case the better practice of having them submitted to a jury was strongly commended, and looking to all the circumstances of this case, we think the proper course to be pursued, and the one which will best subserve the ends of justice, is to reverse the order appealed from, for the reasons already stated, without expressing any opinion upon the validity of the deed, and send the case back under a *procedendo,* in order that the parties may have again the option to submit the question to a jury, or have it heard and decided by the Court upon the evidence now in the record, and such other testimony as they may choose to introduce under the Court's order and direction."

The practice approved by the Court in the above cases was the practice, where other parties claimed the property attached, of docketing cases between the claimants and the attaching creditors, and trying the title on *issues framed or made by the pleas,* by a jury, before the Court makes final disposition of the attachment. But the Court did not hold that where questions of fact are to be determined on a *motion to quash* that the parties are entitled to a jury trial. On the contrary, the Court distinctly recognizes the right of the Court to determine such questions without a jury.

The case of *Lanahan* v. *Heaver, supra,* was not an attachment case, and the Court simply stated the general rule that in civil cases a jury cannot be dispensed with except by the agreement of the parties.

In the case of *Gover* v. *Barnes,* 15 Md. 576, a motion was filed to quash the attachment on the ground that the defendant was not an absconding debtor, and the motion was resisted by the plaintiffs upon the ground that the matters of fact averred in the motion were proper "for trial and decision by a jury, upon issues properly joined between the parties, and ought not to be tried by the Court." On appeal the Court said: "That the Court had authority to entertain the motion to quash, to hear the evidence in relation thereto, and decide the motion without the intervention of a jury, is so

fully sustained by *Lambden* v. *Bowie,* 2 Md. 334, that we consider it unnecessary to enter into any reasoning on the subject." In *Gittings* v. *State,* 33 Md. 458 JUDGE MILLER said: "Motions to dissolve attachments involving sometimes questions of residence and citizenship, and other matters of fact *dehors* the proceedings may be decided by the Court in this mode, and such decisions have never been regarded as infringing the constitutional right of trial by jury." In the case of *Ferrell* v. *Farnen,* 67 Md. 76, the questions before the Court was whether the garnishee and claimant, who elected to try the case upon a motion to quash before the Court, could, after the evidence had been partly taken, dismiss his motion, and by filing a plea try the same question before a jury. In that case the Court said: "As to the objection raised by the appellant, that he was entitled to a jury trial, it is no longer an open question in this Court, since the case of *Wilhelm* v. *Roloson,* 37 Md. x, and the cases there cited, where the right of the Court to hear and determine, on a motion to quash an attachment case for matter *dehors* the record, without the intervention of a jury, was distinctly recognized * * * It is certainly undeniable that the garnishee or claimant who makes a motion to quash, may abandon such motion at any time before the final decision of it. The motion to quash is a summary proceeding, triable before the Court. It may include matters apparent upon the face of the proceedings as well as matters *dehors.* But he may waive his right to a summary proceeding, as far as the matters outside of the record are concerned, and resort to a plea, which does require the intervention of a jury." In the unreported case of *Wilhelm* v. *Roloson,* 37 Md. x, the Court held that, "the Court has the right to hear and decide motions to quash attachments for matters *dehors* the record, without the intervention of a jury."

The cases to which we have referred not only recognize and approve the practice of the courts in hearing motions to quash attachments without the intervention of a jury, but establish their right to do so, and there was, therefore, no

error in the ruling of the Court below in the first exception.

The important question in the case is, can the claim of the appellant be enforced against Mrs. Knabe or her property? In considering that question we must first determine whether the guaranty was made in Maryland or in the State of New Jersey, and that involves a consideration of the nature of her undertaking.

Her endorsement reads, "In consideration of the making, at the request of the undersigned, of the loan evidenced by the within note upon the terms thereof and of the sum of one dollar, the undersigned hereby guarantee to the Union Trust Company of New Jersey, its successors, endorsers or assigns, the prompt payment of the said loan, when due," etc. The evidence shows that the "one dollar" mentioned in the above guaranty was not paid, and the only consideration for the guaranty was the loan to be made on "the within note." *Harper* v. *Davis,* 115 Md. 349; *Nabb* v. *Koontz,* 17 Md. 283, and *Ordeman* v. *Lawson,* 49 Md. 135.

Until the loan to be secured by the note was actually made, the guaranty was executory, and could only become binding upon the making of the loan. The guaranty was not given in consideration of a *promise* on the part of the guarantee to make the loan, but rests upon a loan actually made. Until the loan was made by the Trust Company on the note in accordance with its terms the guaranty was not the complete and binding obligation of the guarantor, but was in the nature of a promise to guarantee. It is said in *Brantly on Contracts* (2nd Ed.), 43-44: "When the offer contemplates an acceptance by the doing of an act, the contract is formed, not by a promise to do that act, but by actually doing it. Consequently, the offer is revocable at any time before the act is done, provided notice of the revocation has been communicated." And it is stated in *Stearns on Suretyship,* page 94, that "an executory contract of guaranty may be considered as a mere offer to contract, and not binding until acted upon"; and in 20 *Cyc.* 1480, that "a general guaranty of pay-

ment by another of a liability to be created in the future
* * * will be terminated by the death of the guarantor." In
the case of *Jordan* v. *Dobbins,* 122 Mass. 168, the Court said:
"An agreement to guarantee the payment by another of
goods to be sold in the future, not founded upon any pres-
ent consideration passing to the guarantor, is a contract of a
peculiar character. Until it is acted upon, it imposes no
obligation and creates no liability of the guarantor. After
it is acted upon, the sale of the goods upon the credit of the
guaranty is the only consideration for the conditional prom-
ise of the guarantor to pay for them.

"The agreement which the guarantor makes with the per-
son receiving the guaranty is not that I now become liable
to you for anything, but that if you sell goods to a third
person, I will then become liable to pay for them if such
third person does not. It is of the nature of an authority
to sell goods upon the credit of the guarantor, rather than
of a contract which cannot be rescinded except by mutual
consent."

It is, therefore, clear, from the very nature and terms of
Mrs. Knabe's undertaking, and upon the authorities cited,
that the endorsement on the note in question did not become
binding on her until the Trust Company accepted her offer to
guarantee the payment of the note *by making the loan.*

A contract is made where the last act is done to make it
a binding obligation upon the parties to it. *Cromwell* v.
*Royal Insurance Co.,* 49 Md. 366; *Stevens* v. *Rasin Fer-
tilizer Co.,* 87 Md. 679; *Latrobe* v. *Winans,* 89 Md. 636;
*Expressmen's Assn.* v. *Hurlock,* 91 Md. 585; *Northwestern
Life Ins. Co.* v. *McCue,* 223 U. S. 234; *Northhampton Ins.
Co.* v. *Tuttle,* 40 N. J. L. 476; *Milliken* v. *Pratt,* 125 Mass.
374; *Irving Nat. Bank* v. *Ellis,* 74 N. J. L. 42, 64 Atl. 1071.
In the last mentioned case a married woman executed in
New Jersey an agreement to guarantee the payment to a
bank in New York of a loan to be made by said bank to her
husband. The guaranty was delivered to her husband in
New Jersey and taken by him to the bank in New York.

The bank accepted the guaranty and made a loan to the husband upon the faith of it. The Court held that, notwithstanding the agreement was executed and delivered in the State of New Jersey, it did not become operative until the bank accepted it and acted upon it, and that therefore the contract was made in New York, and that its validity was to be determined by the law of that State.

It is a well settled rule in this State that the law of the State in which the contract is made determines the capacity of the parties and the validity of the contract. In the case of *Trasher* v. *Everhart,* 3 G. & J. 234, the Court said: "It is a universal principle, governing the judicial tribunals of all civilized nations (for the truth of which no authority need be cited), that the *lex loci contractus* controls the nature, construction and validity of the contract. Courts will always look to the *lex loci,* to give construction to an instrument, and will impart to it validity, according to those laws, unless it would be dangerous, against public policy, or of immoral tendency to enforce it here." To the same effect are the cases of *Hall* v. *Mullin,* 5 H. & J. 190; *Dakin* v. *Pomeroy,* 9 Gill, 1; *B. and O. R. R. Co.* v. *Glenn,* 28 Md. 287; *Eastwood* v. *Kennedy,* 44 Md. 563; *Stewart* v. *Schall,* 65 Md. 289. The same rule is adopted in New Jersey and is distinctly recognized in *Thompson* v. *Taylor,* 66 N. J. L. 253, 46 Atl. 567, and *Irving Nat. Bank* v. *Ellis, supra.* It is urged on behalf of the Trust Company that *Mayer* v. *Roche,* 77 N. J. L. 681, 26 L. R. A. (N. S.) 763, establishes a different rule, but a careful reading of that case does not warrant that conclusion. In that case the evidence did not show where the note in question was delivered, and in that respect it was distinguished by the Court from the case of *Thompson* v. *Taylor, supra.* In the case at bar they offer to guarantee the note was accepted by making the loan in the State of New Jersey.

As the guaranty in question must be regarded as a New Jersey contract, and as the capacity of the parties and the validity of the contract must be determined by the law of the State in which the contract was made, it would seem to

follow that under the provisions of the New Jersey statute the guaranty of Mrs. Knabe can not be enforced against her or her property. The appellant also contends that the evidence shows that the parties agreed that the law of Maryland should control in determining the validity of the endorsement. But as we have said the evidence shows that counsel for Mr. Knabe did not represent Mrs. Knabe, and that she was not a party to any such agreement or understanding. It is also urged that the intention of the parties that the law of Maryland should be applied in determining the validity of the endorsement may be presumed from the fact that the note was dated in Maryland, and the case of *Mayer* v. *Roche, supra,* is relied on. In that case, however, there was no evidence to show where the note was delivered, and the Court said: "We held in *Thompson* v. *Taylor* that the law of the place of contract was decisive on the question of incapacity to contract incident to coverture. The question in this case is whether, upon the bare facts above stated, the place of contract was New York or New Jersey." In the case at bar the "place of contract" is shown to be New Jersey, and where that is the case the rule adopted in *Thompson* v. *Taylor, supra,* applies.

The opinion expressed by the general counsel for the appellant that the statute of New Jersey does not apply to contracts of non-resident married women was not based upon any decision to that effect by the courts of New Jersey, and in view of the decisions of this State and the New Jersey cases to which we have referred, holding that the validity of the contract must be determined by the laws of the State in which it is made, we would not be warranted in adopting his construction of the statute.

It is further insisted that the note and endorsement of January 31st was accepted by Mr. Gill in payment of the balance due on the previous note of $65,000.00. But the contract of Mrs. Knabe was an agreement to pay the note of January 31st, and her offer to become guarantor could only be accepted by making the loan on that note. A *prom-*

*ise* to make the loan could not be substituted for the actual making of the loan, which was the only consideration for her guaranty.

Counsel for the appellant contends also that the parties intended that the agreement of June 30th should be substituted for the note, and that the note is merged in said agreement. The agreement, however, is by its terms an agreement consenting to an extension of the time for the payment of the note, and to *remain* bound as maker and endorsers of the note. It does not alter the original contract of the parties, nor change their liability thereon, but was intended to preserve that liability.

In the third, fourth, fifth and ninth exceptions the witness was asked whether the notes to which we have referred, including the note in suit, were not renewals of previous notes. The appellant was not prejudiced by the answers to these questions, for treating the loan of January 31st, 1911, as a new loan Mrs. Knabe would not, as we have said, be liable for her endorsement.

In the tenth and eleventh exceptions the witness was asked what he did with the note after it was executed by him and his brother William and Mrs. Knabe, and in reply he said he presumed that it was sent to the Union Trust Company. The plaintiff moved to strike out the answers of the witness, and these exceptions are to the refusal of the Court to grant the motions. The appellant was not injured by these rulings because the evidence clearly shows that the note and endorsement were delivered to its attorney in Baltimore City.

In the fourteenth exception the witness was asked, "Was there any other purpose or object in the making or the endorsing and guaranteeing of the $30,000.00 note than to satisfy the demands of the Union Trust Co. of New Jersey?" And he answered, "There was not." We do not see how this evidence could have injured the plaintiff.

The question which the Court refused to permit the plaintiff to ask in the fifteenth exception was answered by the witness on pages 115 and 117 of the record without objection.

In the sixteenth exception the witness was asked, "Is it not a fact that in every instance that a loan is made by your company, that it has to be approved by the executive committee?" And he replied, "I believe so." In view of the fact that the by-laws of the plaintiff were offered in evidence, and the testimony of Mr. Ludlow as to the extent of his authority, the plaintiff could not have been injured by the answer of the witness.

We see no error in the ruling in the seventeenth exception. The defendant had the right to interrogate the witness as to what was done by the plaintiff in making the loan evidenced by the note in suit. Moreover, substantially the same question was asked and answered by the witness without objection.

The evidence referred to in the twentieth exception was substantially covered by the previous testimony of the witness, and the plaintiff could not have been prejudiced by its rejection, even if we assume that it was admissible.

The plaintiff could not have been injured by the ruling in the twenty-second exception, because the witness had already stated the authority given him by the directors of the Trust Company.

Assuming that the witness could properly be asked to state what Mr. Knabe and Mr. Hershey understood about discounting the note, the witness had already given his version of his agreement with the parties referred to, and the plaintiff could not have been prejudiced by the rejection of the evidence referred to in the twenty-fifth exception.

The other exceptions were abandoned by counsel for the appellant, and finding no reversible error in any of the rulings of the Court below the order appealed from must be affirmed.

*Order affirmed, with costs, to the appellee.*

[For the reasons stated, the orders appealed from in the other two appeals, at the same time argued, was affirmed, with costs to the appellee.]